**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TYUS BOWSER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 4:26-cv-02384** |
| **v.** | § | |
| | § | |
| **NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and ANDREW MORRIS,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE NICHOLAS J. GANJEI:

COMES NOW, Plaintiff Tyus Bowser and files this First Amended Complaint against the NFL Players Association and Andrew Morris, and alleges as follows:

**NATURE OF THE ACTION**

1. This case is about a union lawyer who dismissed his client's only contractual claim after personal counsel emailed him that dismissing it was unacceptable. The client was Tyus Bowser, a former Baltimore Ravens linebacker who was trying to recover the salary the Ravens withheld during the 2023 season. The union lawyer is Andrew Morris. He was on staff at the NFL Players Association.

2. When Morris dismissed the grievance, he ended Bowser's only path to that recovery under the NFL–NFLPA Collective Bargaining Agreement. Neither Morris nor anyone at the NFLPA told Bowser the dismissal had happened. To this day the NFLPA has never spoken to Bowser about it. The union also stalled Plaintiff's counsel's effort to obtain the grievance file. The

NFLPA produced nothing until August 26, 2025. The union held back parts of the file even then. The remainder did not come until October 24, 2025, less than six months before this suit was filed.

3. Todd Flanagan, an NFLPA staff lawyer who first handled the grievance, wrote that he wanted the case "inactive" and would rather use it as "leverage for a lawsuit." He postponed the merits hearing without asking Bowser. He turned down both rescheduled dates the arbitrator offered. Making matters worse, on April 28, 2025, Morris received an email from Bowser's personal counsel stating that dismissing the grievance was unacceptable. He dismissed it anyway.

4. Bowser sues the NFLPA for breach of the duty of fair representation. He sues Morris in his individual capacity for legal malpractice and for breach of the duty of loyalty an attorney owes a client. The malpractice and loyalty claims rest on Texas professional standards and on facts about Morris's own conduct. They do not require the Court to interpret any disputed term of the CBA. The Court can decide them by asking what Morris was told, what he did, and what consequences followed.

## PARTIES

5. Tyus Bowser is a former NFL linebacker. He played seven seasons for the Baltimore Ravens. He lives in Harris County, Texas.

6. The NFL Players Association is an unincorporated labor organization based in Washington, D.C. It is the exclusive bargaining representative of NFL players under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a).

7. Andrew Morris is an attorney. He was at the relevant times a staff lawyer in the NFLPA Legal Department. Morris is sued in his individual capacity for conduct outside the scope of any authority the NFLPA had given him. Bowser does not contend that the NFLPA empowered Morris to dismiss a member's grievance over the express objection of the member's personal

counsel. The NFLPA could not have given him that power. The conduct alleged against Morris is therefore his own.

## JURISDICTION AND VENUE

8. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331. The duty of fair representation claim arises under federal law, specifically the National Labor Relations Act, 29 U.S.C. §§ 151–169, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

9. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. Those claims share a common nucleus of operative fact with the federal claim. They are not preempted. Two reasons. First, the conduct alleged against Morris falls outside the NFLPA's representational authority, so the duty of fair representation does not channel it. Second, the claims turn on factual questions about what Morris was told and what he did. They do not require the Court to interpret any disputed term of the CBA.

10. The Court has personal jurisdiction over the NFLPA. The NFLPA represents NFL players who live and work in Texas. It transacts business in Texas continuously. It directed communications about Bowser's grievance into Texas. It postponed and dismissed a grievance filed on behalf of a Texas resident.

11. The Court has personal jurisdiction over Morris. He directed conduct into Texas when he handled the grievance of a Texas resident and when he disregarded an April 28, 2025 email from Bowser's Texas counsel stating that dismissing the grievance was unacceptable.

12. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claims occurred in this District. Bowser lives here. The instructions Morris disregarded were sent from Texas. The economic harm landed here. Defendants also removed this case to this Court from the 215th Judicial District Court of Harris County. (Doc. No. 1).

## FACTUAL BACKGROUND

**A. <u>Bowser's 2023 Knee Injury and the Ravens' NFI Designation.</u>**

13. Bowser signed an NFL Player Contract with the Baltimore Ravens on March 20, 2021, covering the 2021 through 2024 seasons.

14. During the 2023 offseason, Bowser had problems with his right knee. The Ravens treated the issue as a non-football injury. On July 18, 2023, Eric DeCosta, the Ravens' Executive Vice President and General Manager, sent Bowser a letter saying as much.

15. Bowser had surgery with Dr. Neal ElAttrache in Los Angeles. The Ravens paid for it but reserved their position under the CBA that the Club was not, in their view, on the hook for the injury or the surgery because it was allegedly a non-football injury.

16. On July 21, 2023, the Ravens placed Bowser on the Active/Non-Football Injury or Illness list (the "NFI" list). On August 29, 2023, they moved him to the Reserve/NFI list. Bowser missed the entire 2023 season and received no salary that season.

17. Bowser sought outside opinions throughout the season. Dr. ElAttrache continued to follow him. Dr. Nathan Yokel began treating him in October 2023. Dr. Walt Lowe, in Houston, took over in January 2024.

**B. <u>February 2024: Bowser Learns of the Staph Infection.</u>**

18. On February 24, 2024, doctors told Bowser something nobody had said before. His knee was infected and tests had identified *Staphylococcus caprae* in fluid drawn from the joint. Bowser believes the infection traced to medical procedures the Ravens' staff had performed on him during the previous season.

19. That changed the analysis. This revelation changed the analysis of the cause of Bowser's injury because, if the underlying condition was the result of treatment provided through

the Club, the injury was incurred in the performance of services under his Player Contract. That meant his placement on the NFI list (which assumes a non-football cause) was wrong, and he was entitled to his 2023 salary.

20. Four days earlier, on February 20, 2024, the Ravens had sent Bowser another letter from DeCosta. It addressed Bowser's second elected surgery, this time with Dr. Lowe. The Club again disclaimed responsibility.

21. On March 13, 2024, the Ravens terminated Bowser's contract.

### C. The Filing of the Grievance.

22. Bowser hired Micah Dortch and Christopher Lindstrom of Dortch Lindstrom Livingston Law Group to pursue his rights. They contacted the NFLPA to notify it of Bowser's representation and position.

23. On March 19, 2024, Todd Flanagan, then a staff attorney at the NFLPA, emailed Dortch: "Call me today when you can. I need some background facts for my grievance against the Ravens. Will send you the draft before I file to make sure I do not cause any problems on the med mal side." Flanagan held himself out as the person who would prosecute the grievance and committed to coordinate with personal counsel before filing.

24. On April 4, 2024, Flanagan filed the grievance for Bowser. The grievance challenged the NFI placements as improper. It was filed within fifty days of February 24, 2024, the date Bowser first learned of the staph infection. Article 43, Section 2 of the CBA measures the filing window from the later of the underlying occurrence or the date the operative facts became known. The discovery of the infection was the later date. The grievance was therefore timely on its face.

25. The NFL Management Council, on behalf of the Ravens, denied the grievance and asserted timeliness as a defense. The matter was assigned to Arbitrator Sidney Moreland, and the merits hearing was first scheduled for October 15, 2024.

**D. <u>The NFLPA Decides the Grievance Is More Useful Inactive.</u>**

26. However, the grievance never went to a hearing. A trail of NFLPA emails explains why.

27. On August 7, 2024, Flanagan emailed Dortch: "Do we need to schedule his case for the fall?" He answered his own question in the next line: "Since it is better as leverage for a lawsuit, I would rather it just be inactive for awhile." Bowser had not authorized this. The strategy served the union's preferences, not his.

28. On September 10, 2024, Flanagan wrote again. "Emailed you about a month ago. I am going to postpone his case." He added: "He signed a new contract so whatever else it means, he likely will not want to come to the hearing." Nobody at the NFLPA had asked Bowser whether that was true.

29. On September 13, 2024, and again on September 18, 2024, Dortch asked for status and for Bowser's medical records. He wrote: "Let's move it. Can you send me his medical records?"

30. The NFLPA postponed the October 15, 2024 hearing anyway. NFLPA coordinator Sydney Eckert sent the postponement letter and Arbitrator Moreland acknowledged it on September 14, 2024.

31. On October 18, 2024, Arbitrator Moreland offered two new dates: November 15 and December 13, 2024. The NFL Management Council accepted both for the Ravens. On October

23, 2024, Flanagan replied to the Arbitrator and to all parties: "I am not available either of those dates." He suggested no alternative.

32. While the case sat, on or about April 18, 2025, the Management Council filed a Pre-Hearing Motion to Bifurcate and Dismiss the grievance as untimely. The merits hearing was rescheduled to May 20, 2025. The NFLPA had a real answer to the timeliness motion under Article 43, Section 2: the staph-infection discovery on February 24, 2024 reset the fifty-day clock, and the April 4, 2024 filing was within that window.

### E. <u>Bowser's Counsel Tells Morris That Dismissal Is Unacceptable.</u>

33. By April 2025, Andrew Morris was the NFLPA attorney handling Bowser's grievance.

34. On April 28, 2025, Morris emailed Dortch about the case. Morris wrote that the NFL Management Council had filed for a bifurcation hearing on the timeliness issue, which Morris acknowledged the Management Council was "entitled to do." He reported that the parties had not obtained an extension of the response deadline on that motion. Morris then asked to "speak regarding the value of keeping this case active on our end."

35. One minute later, Dortch replied to Morris by email: "This is preposterous—absolutely preposterous that we are not ready for this. Dismissing it is unacceptable."

36. Bowser did not authorize the dismissal of his grievance, nor did his counsel authorize it. The position counsel took on April 28, 2025, in writing, was that dismissal was unacceptable.

### F. <u>Morris Dismisses the Grievance.</u>

37. After receiving counsel's April 28, 2025 email, Morris caused Bowser's grievance to be dismissed.

38. When Morris took that step, he stripped Bowser of his only contractual remedy under the CBA. The Ravens' NFI designations stood unchallenged. Bowser's lost 2023 salary stayed lost. The chance to vindicate his contractual rights through arbitration was gone.

39. Morris's decision to dismiss was not a judgment call about how to litigate the grievance. It was the disposition of the case in a manner counsel had told him in writing was unacceptable. An attorney does not have authority to take that step over the client's express direction. Neither does the union that employs the attorney. Morris's dismissal was therefore outside the scope of any authority the NFLPA, the CBA, or his role as staff counsel could have given him.

### G. <u>The NFLPA Has Never Spoken to Bowser About the Dismissal.</u>

40. To this day, the NFLPA has never spoken to Bowser about the dismissal. There has been no letter. There has been no email. There has been no call. The NFLPA has not communicated with Bowser at all about what happened to his grievance.

41. To date, the NFLPA has given Bowser no reason, justification or explanation for the dismissal. The NFLPA has not told Bowser whether the grievance was dismissed because the union concluded the merits were weak, because the timeliness motion looked likely to succeed, because of the union's preferred strategic posture, or for any other reason. Whatever the reason was, Bowser does not know it.

42. The NFLPA has not told Bowser what his options are. It has not explained any appeal rights. It has not explained any refile rights. It has not given him any assessment of whether the grievance had any chance of succeeding on the merits at all. It has not told him what arguments were made on his behalf, or not made on his behalf, before the dismissal occurred. Bowser has been left completely in the dark by the union and lawyer that was supposed to protect him.

43. The silence is not an oversight, as the NFLPA knew Bowser had personal counsel. The NFLPA knew Bowser's counsel had emailed Morris on April 28, 2025 that dismissal was unacceptable. The NFLPA chose silence rather than disclosure of an act it knew counsel had stated in writing was unacceptable.

**H. <u>The NFLPA's Refusal to Provide the Grievance File.</u>**

44. The NFLPA gave Bowser and his counsel no information about the dismissal. With nothing from the union, Plaintiff's counsel had to ask the NFLPA for the grievance file. The NFLPA did not produce it. Counsel had to ask again. Counsel had to keep asking. Months passed.

45. The NFLPA produced nothing until August 26, 2025. Even then the union held back a substantial portion of the file. Counsel had to keep pressing for the rest.

46. The NFLPA produced what it represented to be the remainder of the file on October 24, 2025. That production came less than six months before this lawsuit was filed on March 2, 2026.

47. The October 24, 2025 production was described as the remainder of the file, but it is not complete. The materials the NFLPA delivered consist largely of Bowser's own medical records from his time with the Ravens. The NFLPA has not produced its internal communications about the grievance, its case memoranda or strategy notes, any exit memorandum or file-transfer document from Todd Flanagan at the time the matter moved to Andrew Morris, the NFLPA's response or non-response to the NFL Management Council's bifurcation motion, or other internal work product showing how the union evaluated and disposed of the grievance. None of those categories of documents has been provided.

48. Based upon the file the NFLPA has produced to date, Plaintiff believes the NFLPA prioritized the union's own institutional interests over Bowser's contractual rights, and that the

internal communications, case memoranda, and exit memos the union continues to withhold would confirm as much. Together with the NFLPA's continued refusal to speak to Bowser or to his counsel about why the grievance was terminated or whether any refiling options exist, the union's withholding of these internal grievance documents has prevented Bowser from learning the full severity of what the NFLPA did to his case.

49. Until the October 24, 2025 production, Bowser could not learn what had been done in his name. The acts that form the basis of this lawsuit did not become reasonably discoverable until that date, and remain only partially knowable today because the file the NFLPA has produced is still incomplete, and no one at the NFLPA has spoken directly to Bowser about any of it.

**I. <u>The Underlying Grievance Had Real Merit.</u>**

50. If the grievance had gone to a hearing, Bowser had two strong, meritorious arguments worth presenting. First, the grievance was timely under Article 43, Section 2 because the operative facts (the infection) were not known until February 24, 2024, which placed the April 4, 2024 filing within the fifty-day window. Second, the NFI placement was improper because the underlying knee condition was identified only after a course of intra-articular procedures performed through the Club, which made the inability to play a consequence of treatment provided in connection with services under the Player Contract.

51. Bowser has retained an independent expert in primary care sports medicine who reviewed the medical records. The expert is prepared to address the medical issues that bear on what an arbitrator would have made of the grievance. The case-within-a-case will be tried on factual evidence and expert opinion. It does not require the Court to construe the CBA itself. It requires the Court to receive evidence about what would have happened if the grievance had proceeded.

**THE STATE-LAW CLAIMS DO NOT REQUIRE INTERPRETATION OF THE CBA**

52. The claims against Morris turn on factual questions about his conduct, not on disputed CBA terms. The relevant facts are: the existence of an attorney-client relationship between Morris and Bowser through the grievance representation; the April 28, 2025 email from Bowser's counsel to Morris stating that dismissal was unacceptable; Morris's decision to dismiss the grievance anyway; the absence of any communication to Bowser; and the consequences for Bowser's contractual rights.

53. The relevant standard of care for this case comes from Texas law that governs attorneys, not from the CBA. Rule 1.02(a) of the Texas Disciplinary Rules of Professional Conduct requires an attorney to abide by a client's decisions concerning the objectives and methods of representation, and reserves to the client decisions on settlement and other case-dispositive matters. Rule 1.03 requires the attorney to keep the client reasonably informed. Rule 1.16 governs the attorney's duties on the disposition and surrender of client materials. None of those duties depend on what the CBA says.

54. The duty of loyalty Bowser invokes against Morris is the same duty every attorney owes a client. It is not a duty owed to a union member by the union.

55. Causation can be established without judicial construction of the CBA. Expert testimony about NFL grievance practice will address how the arbitrator would have ruled on timeliness and on the merits.

**DISCOVERY RULE AND TOLLING**

56. The limitations period on each claim did not begin to run until Bowser discovered, or with reasonable diligence could have discovered, the acts that underlie the claim. For the reasons set out above, that date is no earlier than October 24, 2025, when the NFLPA finally produced

what it represented to be the rest of the grievance file. Even now, the file the NFLPA has produced is incomplete. Internal communications, case memoranda, and exit memos have not been produced. The NFLPA has not even told Bowser or his counsel whether those documents exist.

57. If a different accrual rule applies, the limitations period is equitably tolled. The NFLPA concealed the dismissal from Bowser by saying nothing to him about it. To this day, the NFLPA has never spoken to Bowser at all about what happened. The union also obstructed Plaintiff's counsel's effort to learn what happened. Counsel had to chase the file. The NFLPA produced nothing until August 26, 2025. The union held back parts of the file even then. The October 24, 2025 production was incomplete. The NFLPA continues to withhold internal communications, case memoranda, exit memos, and other work product from the grievance. The NFLPA has not told Bowser or his counsel whether those documents exist, where they are, or what they say.

58. It would be inequitable to allow a union to run out a limitations clock on a member by refusing to tell the member what happened to his case, by stalling counsel's effort to find out, by withholding the file, and by refusing even to confirm whether the rest of the file exists.

59. Even if a six-month federal limitations rule borrowed from § 10(b) of the NLRA were to apply to any of Bowser's claims, that rule cannot run during a period in which the union has refused to tell its own member why his grievance was dismissed, what the dismissal means for his contractual rights, whether he has any appeal or refile options, or whether the underlying claim had merit. The NFLPA still has not given Bowser any of that information, and the file it has produced remains incomplete. A six-month clock cannot lapse against a member who has been told nothing about his case while the union sits on the answers. In any event, this lawsuit was filed less than six months after the NFLPA's October 24, 2025 production.

**COUNT I**
**BREACH OF THE DUTY OF FAIR REPRESENTATION**
**(Against the NFLPA)**

60. Plaintiff incorporates the preceding paragraphs as if set forth herein.

61. The NFLPA owes Bowser a duty of fair representation under federal law. The duty requires the union to act toward members of the bargaining unit without hostility or discrimination, in good faith, and without arbitrary or perfunctory conduct. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967); *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 76 (1991).

62. The NFLPA breached that duty. The breach is documented. It includes:

a. Postponing the October 15, 2024 hearing without consulting Bowser or asking his consent;

b. Choosing to keep the case "inactive" as "leverage for a lawsuit" for the union's strategic purposes, not Bowser's;

c. Refusing both rescheduled hearing dates the Arbitrator offered and proposing no alternatives;

d. Causing the dismissal of the grievance through Morris after Plaintiff's counsel had emailed Morris on April 28, 2025 that dismissal was unacceptable;

e. Failing to advance the staph-infection trigger date as the timeliness answer the union should have made under Article 43, Section 2;

f. Telling Bowser nothing about the dismissal, its effect, or whether the grievance could be re-filed; and

g. Withholding the grievance file in its entirety until August 26, 2025, producing only a partial file then, and continuing to withhold internal communications, case memoranda, exit memos, and other internal work product through today.

63. Based upon the file the NFLPA has produced, Plaintiff believes these were not good-faith errors of judgment. The decisions were driven by what the union preferred, not by any reasoned look at what served Bowser. Conduct taken in defiance of a written communication from

the member's personal counsel stating that the act in question was unacceptable falls outside the wide latitude the law gives unions for honest mistakes.

64. The breach caused Bowser's injuries. If the NFLPA had represented him fairly, the grievance would have been heard on November 15, 2024, December 13, 2024, or May 20, 2025. The Arbitrator would have ruled on timeliness and the merits. Bowser would have had a fair opportunity to vindicate the contractual remedy he sought.

65. Bowser's damages include lost 2023 salary and benefits under the Player Contract, the value of the lost arbitration opportunity, lost future earning capacity, and mental anguish, in amounts to be proven at trial.

**COUNT II**
**LEGAL MALPRACTICE / NEGLIGENCE**
**(Against Andrew Morris in His Individual Capacity)**

66. Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

67. Morris took on the legal representation of Bowser when the grievance file was assigned to him. By doing so, he assumed the professional duties Texas imposes on every lawyer who represents a client, including the duty of competent care, the duty to abide by client decisions, the duty to communicate, and the duty to safeguard client materials.

68. Morris's dismissal of the grievance was outside the scope of any authority the NFLPA had given him. Section 301 of the LMRA does not immunize a union attorney for an act taken in defiance of a written communication from the client's counsel that the very act being contemplated is unacceptable. The cases that protect union attorneys protect them for acts taken pursuant to representational authority. Dismissing a client's case after counsel has put that position in writing is not such an act.

69. Morris breached his duty to Bowser by:

a. Dismissing the grievance after Plaintiff's counsel had emailed him on April 28, 2025 that dismissal was unacceptable;

b. Disposing of the matter without obtaining the client's informed consent on a decision the client alone was entitled to make;

c. Saying nothing to Bowser about the dismissal, its effect, or whether the grievance could be re-filed; and

d. Withholding the grievance file from Bowser after the dismissal.

70. The breach caused Bowser's injuries. If Morris had not dismissed the grievance, it would have proceeded to a merits hearing where Bowser would have had a real chance to recover his lost salary and other contractual remedies. The case-within-a-case can be tried on factual evidence and expert testimony. The Court will not be asked to construe the CBA.

71. Bowser is entitled to actual and consequential damages in amounts to be proven at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(Against Andrew Morris in His Individual Capacity)**

72. Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

73. An attorney owes a client a duty of loyalty. The duty is separate from the duty of professional care. It includes the duty not to act against the client's express direction, the duty not to subordinate the client's interests to the attorney's own or the attorney's employer's, and the duty to disclose material adverse events. Texas courts treat the duty of loyalty as the foundation of the lawyer's fiduciary obligation.

74. Morris's conduct was a breach of loyalty, not a deficiency in the standard of care. He took the very step counsel had told him in writing was unacceptable. He elevated the union's preferred posture (Morris's own framing was "the value of keeping this case active on our end")

over the client's contractual interests. He concealed the dismissal from the client. These are textbook breaches of the duty of loyalty.

75. The conduct alleged in this count is qualitatively different from professional negligence. The Texas anti-fracturing rule does not bar the claim because the gravamen is disloyalty, not lack of skill.

76. Bowser was harmed by the breach. He is entitled to all remedies Texas law makes available for breach of fiduciary duty, including actual damages and, where appropriate, fee forfeiture.

**DAMAGES**

77. Due to the actions and omissions described above, Bowser suffered the following damages:

a. Lost salary and benefits under his Player Contract for the 2023 season;

b. The value of the contractual remedy he would have pursued through arbitration;

c. Lost future earning capacity tied to the contract termination and the inability to clear his record through the grievance process;

d. Mental anguish and emotional distress;

e. Pre- and post-judgment interest at the highest lawful rate;

f. Costs of court; and

g. Reasonable and necessary attorneys' fees as permitted by law.

**CONDITIONS PRECEDENT**

78. All conditions precedent to recovery have been met.

**JURY DEMAND**

79. Bowser demands a jury trial.

**PRAYER FOR RELIEF**

For the reasons stated, Bowser asks the Court to enter judgment in his favor and against the NFL Players Association and Andrew Morris, jointly and severally where appropriate, for the damages outlined above and any other relief to which he has shown himself entitled, whether in law or in equity.

Respectfully submitted,

By: /s/ *T. Micah Dortch*
T. Micah Dortch
SDTX No. 630903
Texas State Bar No. 24044981
Email: Micah@dll-law.com
DORTCH LINDSTROM LIVINGSTON LAW GROUP
2613 Dallas Parkway, Suite 220
Plano, Texas 75093
Telephone: (214) 393-1212
Facsimile: (888) 653-3299

Christopher D. Lindstrom
SDTX No. 33525
Texas State Bar No. 24032671
Email: Chris@dll-law.com
DORTCH LINDSTROM LIVINGSTON LAW GROUP
4306 Yoakum Blvd., Suite 270
Houston, Texas 77006
Telephone: (713) 968-0060
Facsimile: (888) 653-3299

**ATTORNEYS FOR PLAINTIFF**
**TYUS BOWSER**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2026, a true and correct copy of the foregoing was served on all parties of record through their attorneys via ECF in accordance with the Federal Rules of Civil Procedure.

*/s/ T. Micah Dortch*_________
T. Micah Dortch